## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Craig S. Mehrmann, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since February 2023. I am currently assigned to the Boston Division, Portland, Maine Resident Agency on the FBI Maine Safe Streets Task Force. As part of my duties, I investigate crimes involving violent crimes against children. I have received formal and on-the-job training in the investigation of cases involving these crimes and have investigated such crimes prior.

2. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Snap Inc. ("Snap"), an electronic communications service and/or remote computing service provider headquartered at 2772 Donald Douglas Loop North Santa Monica, CA 90405. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snap to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3. The facts in this affidavit come from my personal observations, training, and experience, and information obtained from other law enforcement (LE) officers and

witnesses. This affidavit is intended to provide only the facts necessary for a determination of probable cause for the requested search warrant. I have not included every fact known to me.

4. This affidavit is made in support of an application for a search warrant for information stored on a Snapchat account with username "bigadel20051" (Hereinafter referred to as the SNAPCHAT ACCOUNT).

5. Specifically, this application is seeking a warrant to search information regarding the digital data located on the SNAPCHAT ACCOUNT as further described in Attachment A.

6. As set forth in more detail below, I respectfully submit that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251(a) (Production of Child Pornography), 18 U.S.C. §§ 2252A(a)(2) (Receipt or Distribution of Child Pornography), 18 U.S.C. §§ 2252A(a)(3)(b) (Solicitation of Child Pornography), 18 U.S.C. §§ 2252A(a)(5)(b) (Possession of Child Pornography), as well as 18 U.S.C. §§ 2252A(b)(1) and 2252A(b)(2) (Attempt), (Collectively referred to as the "TARGET OFFENSES") is located within the SNAPCHAT ACCOUNT.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## ABOUT THE NATIONAL CENTER FOR MISSING AND EXPLOITED CHILDREN

8. The National Center for Missing and Exploited Children (NCMEC) is a nonprofit organization that provides services to families and professionals that relate to the abduction and sexual exploitation of children. NCMEC also operates the CyberTipline and the Child Victim Identification Programs (CVIP) to assist law enforcement officers and others in identifying and rescuing victims of child exploitation and child sexual abuse material (CSAM). As part of the NCMEC directives, NCMEC works with electronic service providers (ESPs) and remote computing service providers, such as Google, to reduce the dissemination of CSAM images and/or videos on the internet.

9. When an ESP becomes aware of suspected CSAM images and/or videos, the ESP representative may view the images and/or videos in question to determine if the images and/or videos are CSAM and thus a violation of the ESP's use agreement with the user(s). If the image and or video is deemed by the ESP representative to be CSAM, the ESP will file an electronic report with the NCMEC. The reporting ESP will provide in the NCMEC report samples of the CSAM images and/or videos, IP addresses captured at the date and time of the CSAM file being uploaded by the user, and any registration information (if available). NCMEC will then research more publicly available information based on the information provided to them by the ESP to determine, if possible, the identification and/or geographic location of the user uploading the child pornography images and/or videos to forward the report to the appropriate jurisdiction. NCMEC will then forward their report to the Regional Internet

Crimes Against Children (ICAC) Commander for further investigation. The Maine Computer Crimes Unit (CCU) is the Regional ICAC for Maine.

**PROBABLE CAUSE**

10. On August 1, 2025, NCMEC received a CyberTip regarding apparent CSAM. The NCMEC CyberTip report number is 217257667 and was submitted by Electronic Service Provider (ESP) Snapchat in accordance with federal law, 18 U.S.C.A. § 2258A. NCMEC reviewed the files submitted by Snapchat in their entirety before forwarding the CyberTip to MSP CCU. Snapchat identified an account with username "bigadel20051" to be associated with apparent CSAM. The Snapchat account was registered with Yahoo email address bigadel2005@yahoo.com and phone number (207) 420-5687. Snapchat indicated this account was used to upload one (1) file of apparent CSAM on July 31, 2025 at 12:13:19 UTC. Further, the CyberTip indicated that IP address 64:222.238.231 was associated with username bigadel20051 on August 1, 2025 at 4:42:34 UTC.[1]

11. Augusta, Maine Police Department (APD) is an affiliate of the MSP CCU. A Detective at APD was assigned to investigate this CyberTip. An APD detective received a copy of the apparent CSAM associated with the CyberTip and confirmed the video appeared to be CSAM. The video shows a young female, who appears to be prepubescent, lying on her back with her vagina exposed. The evidence that the child is prepubescent is that she does not have any signs of pubic hair growth as well as the size of her body being small and childlike. Based on the Detective's training, education, and

[1] The CyberTip indicated that the IP address data "may be associated with one of several sources, including logout or app authentication events."

experience, he determined the child is under the age of 10 years old. In the video there is an adult performing oral sex on the child. I have reviewed the video file previously reviewed by the APD Detective and agree with his conclusions. The video has a hash value of "0d7ad586f3bfc33a65714d23725b9b0a". The file name in the NCMEC report is listed as "bigadel20051-null-aa14c9b1-3bcd-5dff-bfbc-ab2c7890837b~21067-bc80212f60-content.mp4". Still images from this video are marked as Exhibit 1 and submitted herewith under seal.

12. The APD Detective was advised by NCMEC Technical Support that the child had not yet been identified, and that the video has been circulating since 2016.

13. On October 29, 2025, the APD Detective called telephone number (207) 420-5687 and engaged in a conversation with a male individual who answered the call. The male individual identified himself as Adel Al Rashid and confirmed that he was the user of the phone. Al Rashid also advised that no one else uses his phone. Al Rashid confirmed that he lived at 45 Cushnoc Drive, Augusta, Maine. During this conversation, the Detective did not inform Al Rashid about the investigation.

14. On November 12, 2025, Maine District Court Judge Amy Dietrich issued a search warrant authorizing the search of 45 Cushnoc Drive, Augusta, Maine. A copy of the search warrant and affidavit submitted in support thereof is attached hereto as Exhibit 2. On November 13, 2025, APD executed the state search warrant at 45 Cushnoc Drive, Augusta, Maine. Present at the residence at the time of the search warrant execution were Al Rashid along with Sura Al Mohammed and Ayman Al Rashid. The residence was secured for safety, and all parties were informed of the reason for the search warrant. Al Rashid was provided with a copy of the state search warrant. After confirming he did not have any electronics on his person, Al Rashid was advised that he

was not under arrest or detained and was free to go. The APD Detective further explained that he would like to speak to Al Rashid, but he was not required to do so. Al Rashid stated he understood and wanted to speak with APD about the case. During the initial part of the interview, Al Rashid stated his Snapchat account was hacked a few months ago, sometime in September or October. [NOTE: The NCMEC report was generated on September 22, 2025.] The APD Detective confirmed with Al Rashid that when Al Rashid used the term hacked, he meant his account shut down, and that he could no longer access the account from that time onward. Al Rashid went on to explain that he does not use the account much, but when he tried and log in, it would not let him. He stated that "it said sexual abuse or something like that." The APD Detective confirmed with Al Rashid that he received a message that said something about sexual abuse. The APD Detective spoke with Al Rashid about the video described above, and whether Al Rashid remembered getting a video of a child and it being of a sexual nature. Al Rashid stated "no". The APD Detective then showed Al Rashid a screen shot image of the video described above and asked him if he remembered the video and he stated "no".

15. The APD Detective asked what electronics Al Rashid had in the house, and Al Rashid stated he had a phone and an Apple watch. He further stated there was a computer which everyone in the home uses. The APD Detective asked how long he has had his current phone, and Al Rashid said he got a new phone a few weeks ago because the old one wasn't charging and was broken. Al Rashid further advised that he has a new Snapchat account on the new phone. The APD Detective confirmed with Al Rashid that his Snapchat email was bigadel2005@yahoo.com and the phone number associated with the Snapchat account is his current number, (207) 420-5687.

16. I have reviewed subscriber records obtained from U.S. Cellular/T-Mobile for telephone number (207) 420-5687. These records list Adel Al Rashid, of 15 Hope Way, Unit 1, Augusta, Maine, as the "primary" contact name associated with the account for telephone number (207) 420-5687.[2] The email address associated with the account is listed as bigadel2005@yahoo.com. Subscriber records further reveal that on November 4, 2025, the device associated with the account switched from an Apple iPhone 14 Pro to an Apple iPhone 17, which was associated with the account until November 13, 2025, the date on which the search warrant was executed at Al Rashid's residence.

17. I have reviewed information obtained from Consolidated Communications in response to a Grand Jury subpoena for subscriber information associated with IP address 64.222.238.231 on 8/1/2025 04:42:34 UTC. The information provided by Consolidated communications revealed that the subscriber associated with the IP address was Sura Al-Mohammed, with a service address of 45 Cushnoc Drive, Augusta, Maine, telephone number (207) 420-5687.

18. I have obtained information from United States Customs and Border Patrol related to a 2012 visa application submitted by Al Rashid. In these records, Al Rashid's spouse was identified as Sura Abdalmuhsen Abdalhusen Al Mohammed.

19. On November 19, 2025, the United States Attorney's Office sent a letter to Snap requesting that all records, communications, and other evidence for the account

[2] The records also indicate that "Mohammed Khadim," of 15 Hope Way, Unit 1, Augusta, Maine, is an "authorized" contact associated with the account.

associated with bigadel2005@yahoo.com or 207-420-5687 be preserved for a period of 90 days.

20. Based on the above facts, I believe there is probable cause to search the contents of the SNAPCHAT ACCOUNT for evidence, contraband, fruits, and instrumentalities of the TARGET OFFENSES.

## RELEVANT INFORMATION REGARDING PERSONS INVOLVED IN THE PRODUCTION, DISTRIBUTION, AND POSSESSION OF CHILD PORNOGRAPHY AND ONLINE CHILD ENTICEMENT

21. As set forth above, there is probable cause to believe that the Snapchat Account has been used to distribute, transport, receive, and possess child pornography. Additionally, there is probable cause that evidence relevant to this ongoing investigation will be found within data associated with the Snapchat Account. Based upon my training and experience in child sexual exploitation and CSAM investigations as well as through conversations with other officers with knowledge and experience with these types of investigations, I know the following:

a. Those who have possessed and/or disseminated CSAM or child sexual exploitation material and/or disseminated obscene material to purported minors have an interest or preference in the sexual activity of children. Persons who are involved with CSAM generally have other sexually explicit materials on additional accounts and/or other digital media devices related to their interest in children, which may consist of photographs, motion pictures, videos, books, slides, text material, computer graphics and digital or other images/visual material for their own sexual gratification. This often includes what may be termed as child erotica or child exploitation material, which may consist of images or videos such as

minors in lingerie or text writing involving sex with minors that do not rise to the level of CSAM, but nonetheless fuel their deviant sexual fantasies involving minors. I am aware that this sort of material has been admitted in trials under Fed.R.Evid. 404(b) to prove such things as the possessor's knowledge, intent, motive, and identity to prove the person has a sexual interest in minors. I understand that they may upload or import (meaning transfer) this illicit imagery, including CSAM, onto multiple digital media devices and/or accounts so they can access such material readily to satisfy their prurient desires.

b. Individuals who collect CSAM often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of CSAM and child erotica. They do this to gain status, trust, acceptance, and support and to increase their collection of CSAM and child erotica. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, peer-to-peer (P2P) chat and file sharing programs, e-mail, e-mail groups, bulletin boards, Internet Relay Chat (IRC), newsgroups, Internet clubs, and various forms of Instant Messaging such as Snapchat, WhatsApp, Facebook Messenger, Yahoo Messaging, Telegram, and Kik that are sometimes saved on the users' computer or other digital storage media. They may upload files from their CSAM and child erotica collections onto multiple social media accounts where they communicate with others sharing their interests.

c. These individuals typically retain correspondence with these other like-minded individuals. They will make efforts generally to conceal such correspondence as they do with their contraband material, and they often maintain lists of names, account identifiers and other identifying information about individuals with whom they have been in contact and who share the same interests in child pornography.

d. Besides CSAM and child erotica, such individuals often produce and/or collect other written material about sexual activities with minors, which range from fantasy stories to medical, sociological, and psychological writings, which they save to understand and justify their illicit behavior and desires.

e. Individuals who collect CSAM often collect, read, copy, and/or maintain names, addresses, including e-mail addresses, phone numbers, and lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests or have CSAM and child erotica for sale or trade. These contacts are maintained for personal referral, exchange or, sometimes, commercial profit. They may maintain these names on computer storage devices, web sites or other Internet addresses. Their discovery can serve as leads to assist law enforcement in proving the instant case and in apprehending others involved in the underground trafficking of CSAM as well as identifying the origin of the images or videos to assist with locating the child victims depicted in the imagery.

f. Collectors and distributors of CSAM may also receive sexual gratification, stimulation and satisfaction from contact with children, both in person as well as online.

g. Individuals who collect CSAM often retain explicit materials for long periods and may go to great lengths to conceal and protect from discovery, theft, and damage, their collections of illicit materials. Because of their desire to retain child pornography together with the sense of security afforded by using digital media devices and accounts, the collectors will often retain these CSAM and child exploitation imagery for lengthy periods of time. These individuals usually maintain their collections of sexually explicit materials in the privacy of their own homes and possessions. These individuals may protect their illicit materials from discovery by other through use of passwords, and encryption, and other security measures, including on third party image storage sites via the Internet. They often maintain these collections for several years and keep them close by, usually at the individual's residence, to enable the collector/manufacture to view and/or access the collection, which is valued highly.

h. In some instances, these depictions are actual photographs or images of the suspect's own sexual activity with past or present child victims. This imagery serves as archives of hands-on offenses and/or CSAM that they enticed real children to produce, which tends to be extremely important to these individuals. Such individuals may keep such depictions as means of plying, broaching or titillating the sexual interests of new or prospective

child victims. They may also retain them for lengthy periods of time for their own personal arousal. These offenders are less likely to destroy CSAM or child erotica from child victims known to them. They may send such materials to others with similar deviant interests to brag about their conquests and/or view these produced materials as akin to trophies. In such a manner, hands on offenders may keep child pornography collection to fuel their interests. They may import such imagery from one device to another to keep the material readily available for their lascivious interests.

## BACKGROUND CONCERNING SNAPCHAT[3]

22. Snap, the owner of Snapchat, is a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Snapchat is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Snapchat accounts like the SNAPCHAT ACCOUNT listed in Attachment A, through which users can share messages, multimedia, and other information with other Snapchat users.

23. Snap collects basic contact and personal identifying information from users during the Snapchat registration process.

24. Snap also collects and retains information about how each user accesses and uses Snapchat. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information

[3] The information in this section is based on information published by Snap on its website, including, but not limited to, the following document and webpages: "Snap Inc. Law Enforcement Guide," available at https://www.snapchat.com/lawenforcement; and "Snapchat Support," available at https://support.snapchat.com/.

about devices and web browsers used to access an account, and session times and durations.

25. Each Snapchat account is identified by its username.

26. Snapchat offers four primary ways for users to communicate with each other.

27. **Snaps.** A user takes a photo or video using their camera phone in real-time. The user then selects a time limit of 1-10 seconds for the receiver to view the photo or video. A user can elect to have the photo/video saved in their phone's photo gallery or just sent via Snapchat, without being saved. The photo/video can then be sent to a friend in Snapchat. The snap is deleted after the selected amount of time. If a recipient attempts to take a screenshot of the snap to save on his/her phone, the application will notify the sender of this behavior.

28. Snapchat states that it deletes each snap from its servers once all recipients have viewed it. If a snap has not been viewed by all recipients, Snapchat states that it retains the snap for thirty days.

29. **Memories**. Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. A user can also edit and send Snaps and create Stories from these Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by Snapchat and may remain in Memories until deleted by the user.

30. **Stories.** A user can also add the photo/video Snap to their "Story." Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchatters or just the user's friends for up to 24 hours. Stories can also be saved in Memories.

31. **Chat.** A user can also type messages to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message (text or photo) that he or she wants to keep. The user can clear the message by tapping it again.

32. Snapchat also obtains a variety of non-content information from its users.

33. **Usage Information.** Snapchat may collect information about how users interact with its services, including which search queries they submit, and how they communicate with other users, including maintaining a log of all snaps to and from an account for the last 31 days, for 24 hours of posted Stories, and for any unopened Chats or those saved by a sender or recipient, and how a user interacts with these messages (such as when a user opens a message).

34. **Device Information.** Snapchat collects information about the devices of its users, including information about the user's hardware and software, such as the hardware model, operating system version, device memory, advertising identifiers, unique application identifiers, apps installed, unique device identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones, and whether the user has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength.

35. **Device Phonebook.** Snapchat may collect information about the phonebook of the user's device.

36. **Cameras and Photos**. Snapchat may collect images and other information from the user's device's camera and photos.

37. **Location Information**. Snapchat may collect information about the user's location, including precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses.

38. **Snap Map**. Snapchat allows a user to share location information with his/her friends and also obtain location information about the user's friends. Based on such information, Snapchat places the friends' locations on a map viewable to the user.

39. **Information Collected by Cookies and Other Technologies**. Snapchat may collect information through cookies and other technologies about the user's activity, browser, and device.

40. **Log Information.** Snapchat collects log information when a user uses Snapchat's website, including device information, access times, pages viewed, IP address, and pages visited.

41. In my training and experience, evidence of who was using the Snapchat accounts referenced in paragraph 22 and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

42. For example, the stored communications and files connected to a Snapchat account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos,

videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

43. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Snap can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, [[email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time)]] may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

44. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45. Other information connected to the use of Snapchat account may lead to the discovery of additional evidence. For example, account activity may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity,

documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

46. Therefore, Snap's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Snapchat. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

47. Based on the forgoing, I request that the Court issue the proposed search warrant.

48. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Snap. Because the warrant will be served on Snap, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

CRAIG S. MEHRMANN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Jan 09 2026

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title